☐ Original ☐ D



CLERK'S OFFICE
A TRUE COPY
Nov 18, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* <br> The Cellular Telephone Assigned Call Number (949) 566-3012, as further described in Attachment A | ) ) ) ) ) ) ) |

Case No. **24-M-534 (SCD)**

Matter No. 2022R00505

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before        12-2-24        *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to        Hon. Stephen C. Dries        .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for **30** days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:        11-18-24. 11:10 am

*Judge's signature*

City and state:   Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to Be Searched**

1.    The cellular telephone assigned call number (949) 566-3012, with listed subscriber John
      MARIN (the "TARGET CELLPHONE"), whose wireless communications service
      provider is Verizon, headquartered at 180 Washington Valley Road, Bedminster, New
      Jersey, 07921.

2.    Records and information associated with the TARGET CELLPHONE that is within the
      possession, custody, or control of Verizon, including information about the location of
      the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.  The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period from November 1, 2024, to present:

i.  Names (including subscriber names, usernames, and screen names);

ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.  Local and long-distance telephone connection records;

iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.  Length of service (including start date) and types of service utilized;

vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number

("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

3

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at

4

such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribution of cocaine), 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate distribution of cocaine), 18 U.S.C. § 1956 and 1957 (money laundering), 18 U.S.C. § 1956(h) (money laundering conspiracy), and 31 U.S.C. § 5331 (failure to file Form 8300, Reports of Cash Payments Over $10,000 Received in a Trade or Business) involving Brian WILBERT, Antonio LONG, John MARIN, Bobby PERRY, Graciela GONZALEZ CRUZ, Michael ALEMAN, and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

5

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Nov 18, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Cellular Telephone Assigned Call Number (949)<br>566-3012, as further described in Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No. 24-M-534 (SCD)

Matter No. 2022R00505

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846;<br>18 U.S.C. § 1956 (a)(1)(B)(i) | Possession with the intent to distribute controlled substances; Conspiracy to<br>possess with the intent to distribute controlled substances; and Money laundering. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

CURT R HANSEN  Digitally signed by CURT R HANSEN
Date: 2024.11.15 13:59:21 -06'00'

*Applicant's signature*

Curt Hansen, HSI SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means).*

Date: 11-18-24

*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, HSI Special Agent Curt Hansen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (949) 566-3012, with listed subscriber John MARIN (the "TARGET CELLPHONE"), whose service provider is Verizon, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey, 07921.  The TARGET CELLPHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      I am a Special Agent ("SA") with the United States Department of Homeland Security, Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin.  I have been employed with HSI as a Special Agent for approximately three years.  Prior to employment with HSI, I worked as a Deputy United States Marshal, Federal Air Marshal, and United States Border Patrol Agent. I have been a sworn federal law enforcement officer specifically investigating crimes involving narcotics, firearms, smuggling, terrorism, and immigration since September 2011. Throughout my law enforcement career, I have received training in general law enforcement and in specialized areas including narcotics and human smuggling. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.  Since becoming employed as a federal agent, I have completed the Criminal Investigator Training Program at the Federal Law

Enforcement Training Center in Brunswick, Georgia. As part of my duties and responsibilities as an HSI Special Agent, I am authorized to investigate crimes that involve narcotics violations pursuant to Title 21, United States Code.

3.      As part of my duties as an HSI Special Agent, I have experience conducting criminal investigations involving narcotics, firearms, gangs, and human smuggling and have participated in the execution of search warrants in such investigations. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. Through my training and experience, I am familiar with the way in which narcotic traffickers conduct their business, including, but not limited to: the types and amounts of drugs distributed; the types and amounts of profits made; the methods of importing and distributing controlled substances; the use of mobile telephones, email accounts, and the Internet to facilitate their transactions; and the use of numerical codes and code words to conduct their dealings.

4.      I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the distribution and sale of controlled substances, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

2

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated. Throughout this affidavit, reference will be made to case agents or investigators. Case agents or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.  The investigators included a licensed Certified Public Accountant who retired after 28 years as a criminal investigator with the Internal Revenue Service and has contracted since 2011 as a Senior Financial Investigator with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribution of cocaine), 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate distribution of cocaine), 18 U.S.C. § 1956 and 1957 (money laundering), 18 U.S.C. § 1956(h) (money laundering conspiracy),  and 31 U.S.C. § 5331 (failure to file Form 8300, Reports of Cash Payments Over $10,000 Received in a Trade or Business) have been committed, are being committed, or will be committed by John MARIN, and others.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these

3

criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

7. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

### SUMMARY OF PROBABLE CAUSE

8. Federal law enforcement agencies -- including HSI, the Internal Revenue Service-Criminal Investigation, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, -- are investigating the Marin drug trafficking organization's ("DTO") distribution of illegal drugs, including large quantities of cocaine, across the United States and the DTO's money laundering operation. As discussed below, Marin is believed to be the leader of this drug trafficking conspiracy and money laundering operation. Marin has been utilizing commercial shipping entities including the Federal Express ("FedEx") to distribute drugs across the United States and to receive drug proceeds. Marin conspired with Long to supply Milwaukee, Wisconsin distributors, the subject referred to herein as Confidential Source #1 ("CS#1"), and Perry, with as much as 30 kilograms of cocaine, per month from at least 2017 through 2022. Participants in the Marin DTO and money laundering operation include Marin, Marin's wife, Julieana Munoz, Graciela Gonzalez Cruz, Antonio Long, Brian Wilbert, Michael Aleman, Rafael Lomeli, Rafael Ponce, Gerardo Arriaga-Diaz, Bobby Perry, and others known and unknown to distribute large quantities of illegal drugs. Marin utilized his jewelry business, "JM Time Corp / R&J Watch Co" (**Subject Premises 1**) to facilitate and disguise his cocaine

4

trafficking activities and the proceeds derived therefrom in various ways, including the following:

a.  Long, a resident of Gilbert, Arizona, brokered shipments of large quantities of cocaine from Marin to CS#1 and Perry by inquiring from these distributors how much cocaine he should order, then placing the orders with Marin. These communications occurred via electronic communication devices;

b.  Marin delivered the cocaine from JM Time Corp / R&J Watch Co's physical location at 631 S. Olive Street, Los Angeles, California 90014 to Brian Wilbert, Antonio Long's cousin, who drove the cocaine from California to Milwaukee, Wisconsin. Cocaine was seized by HSI during an interdiction operation targeting Wilbert. Wilbert later admitted to picking up the cocaine from 631 S. Olive Street and driving it to Wisconsin. Global positioning data obtained by a GPS device placed on Wilbert's vehicle corroborates that Wilbert picked up the cocaine from 631 S. Olive Street;

c.  Based upon Marin's iCloud records, and Long's admissions that he had a substantial drug debt that he owed to Marin and would make periodic payments based upon his available funds, it appears that Long continued to pay Marin related to their prior drug transactions even after the execution of a federal search warrant at Long's residence in 2023. Based upon the records, Long made what appears to be a payment to Marin towards the drug debt as recently as July 2024.

d.  The Milwaukee, Wisconsin distributors of Marin's cocaine shipped the currency derived from their sales of the cocaine to Marin via his business, "R&J"; i.e., JM Time Corp / R&J Watch Co. The shipments were made through commercial parcel shipping company Federal Express. Marin disguised the large amounts of cash drug proceeds being shipped to him as proceeds from his business's (JM Time Corp / R&J Watch Co) sale of jewelry. Marin provided fictitious invoices to his drug distributors for inclusion with the cash being shipped from the drug distributors to Marin. The invoices were prepared through

5

an internet (computer/cell phones) application hosted by Wave Financial USA, Incorporated;

e. Marin provided his cocaine distributors with FedEx labels for use in shipping their drug proceeds to Marin. Marin generated the labels at a neighboring business, IFS Inforsure, Incorporated. Those FedEx labels listed both the sender and the receiver of the currency-ladened packages as Marin through his business, abbreviated as "R&J". Thus, the labels disguised the packages as being related to the jewelry business and the labels concealed the true identities of the persons sending the packages, as well as the locations from which the packages actually originated;

f. Marin and other individuals deposited some of the drug proceeds into his JM Time Corp bank accounts, thereby disguising the drug proceeds as jewelry proceeds. Marin also established other alleged business entities (and bank accounts in their names) through which the drug proceeds, after being commingled in the JM Time Corp bank accounts, were transferred to further disguise the source of the funds. Said accounts were used to conduct personal transactions, including some with Marin's co-conspirators;

g. Marin, in the name of JM Time Corp / R&J Watch Co, often received currency payments greater than $10,000, including the parcels shipped from CS#1 which often contained more than $200,000 in drug proceeds. Marin was required to file a currency transaction report with the United States Department of Treasury's Financial Crimes Enforcement Network (FinCEN), which Marin failed to do;

h. Marin eventually conspired with other individuals, including Michael Aleman and Graciela Gonzalez-Cruz, to establish fictitious business entities for which they too could produce fictitious invoices and FedEx labels, and through which Marin's cocaine distributors would ship their drug proceeds to Marin. This too required the filing of Form 8300 (currency transaction reports), which were not filed; and

6

i. Gonzalez-Cruz would use her apartment at 12550 Crenshaw Boulevard Unit #410, Hawthorne, California 90250 **(Subject Premises 3)** to receive large quantities of FedEx parcels containing US currency using false invoices under the name of Virgo Stones and Jewelry Co. CS #1 sent currency ladened FedEx parcels to Gonzalez-Cruz and provided the false invoices to case agents. Historical FedEx subpoenas compared to recent ones show the same pattern of parcel traffic to Gonzalez-Cruz indicating she is still receiving parcels of currency, as Virgo Stones Jewelry Co. was created for the sole purpose of making currency parcels look like legitimate business parcels. According to Antonio Long, after Gonzalez-Cruz receives the parcels, she gives them to Marin as he handles all of the narcotics proceeds.

9. As set forth herein, law enforcement believes evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the three **Subject Premises** and on the persons of Marin, Gonzalez Cruz, Aleman, Munoz, Arriaga-Diaz, Lomeli, and Ponce.

10. Case agents secured federal search warrants for Marin's business, residence, and person, which were authorized on November 14, 2024. Case agents intend to execute those warrants in the next week and believe that tracking the location of Marin's phone will assist in locating Marin and will reveal the places he frequents.

## PROBABLE CAUSE

11. The United States, including HSI, is conducting a criminal investigation of Brian WILBERT, Antonio LONG, John MARIN, Bobby PERRY, Graciela GONZALEZ CRUZ, Michael ALEMAN and others regarding possible violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribution of cocaine), 21 U.S.C. § 843(b) (unlawful use of a

7

communication facility to facilitate distribution of cocaine), 18 U.S.C. § 1956 and 1957 (money laundering), 18 U.S.C. § 1956(h) (money laundering conspiracy),  and 31 U.S.C. § 5331 (failure to file Form 8300, Reports of Cash Payments Over $10,000 Received in a Trade or Business).

12.     In August 2022, HSI Milwaukee, Milwaukee Police Department Violent Crimes Unit (MPDVCU), along with members of DEA Group 68 initiated an investigation into individuals distributing cocaine throughout Milwaukee, Wisconsin.   HSI identified the individuals involved in this cocaine drug trafficking as, among others, Brain WILBERT, Antonio LONG, John MARIN, Graciela GONZALEZ CRUZ, Michael ALEMAN, and Bobby PERRY.

13.     On August 9, 2022, Milwaukee Police Department Violent Crimes Unit (MPDVCU) District 3 executed a Wisconsin State search warrant issued by the Circuit Court of the 1st Judicial District of Wisconsin at 5709 North 78th Street, Milwaukee, Wisconsin.  The occupants of the residence were not present during the execution of the search warrant.  During the search of the residence, Officers from MPDVCU located and seized crack cocaine, marijuana, psilocybin, two handguns (Glock 19 and Sig P365), various ammunition with high-capacity magazines, high dollar jewelry items, and $10,076.00 in US currency.  A black Samsung smartphone was also seized.  MPDVCU also seized various scales with narcotic residue on them as well as other narcotic related paraphernalia.  Officers of the MPDVCU seized bank documents and invoices that displayed large currency transactions for jewelry, automobiles, and transfers of currency.  MPDVCU located documents that indicated the target for the search warrant had a storage unit at W135N8945 Wisconsin 145, Menomonee Falls, Wisconsin in Waukesha County, Wisconsin.

14.     That same day, MPDVCU applied for and obtained an additional search warrant for storage unit number 515 at W135N8945 Wisconsin 145, Menomonee Falls, Wisconsin.

8

During the search of the storage unit, MPDVCU located 21 clear plastic baggies containing cocaine and five pressed bricks of a cocaine. A combined total of 5.8 kilograms of cocaine was present. MPDVCU also recovered 20 large vacuum sealable plastic bags containing marijuana with a total weight of 18.7 pounds. A .9mm Palmetto State Armory AR-15 (AR Pistol) and a Maverick model 88 12-gauge shotgun with sawed off barrel were located within the storage unit. Finally, MPDVCU seized approximately $39,610 in US currency from the unit.

15.     On August 18, 2022, the MPDVCU requested assistance from HSI Milwaukee and DEA Group 68 to assist with the investigation. Through information obtained from a confidential source (CS #1), historical law enforcement records, electronic surveillance, toll record analysis, social media exploitation, and open-source databases, HSI Special Agents and MPDVCU determined the source of supply for the cocaine that was seized is John Marin, as brokered through Antonio Long. Long orders large quantities of cocaine from Marin. Long sends his driver, Brian Wilbert, to physically acquire the cocaine from Marin's jewelry store business and to transport the cocaine from Los Angeles, California to Milwaukee, Wisconsin. Marin informs Long of the amount owed to him for the cocaine and, via emails, provides Long with a FedEx label for use in shipping currency payments to Marin. Marin also provides Long with a fictitious invoice from his jewelry business, JM Time Corp / R&J Watch Co. The purpose of the invoice, which is intended to accompany the currency being shipped to Marin via FedEx, is to disguise the drug proceeds as jewelry-related proceeds. Investigators have determined that the Long / Marin drug trafficking organization (DTO) distributes as many as 30 kilograms of cocaine monthly to the Milwaukee, Wisconsin area, which at current Milwaukee area prices of between $21,000 to $24,000 per kilogram would generate approximately $630,000 to $720,000 of cocaine proceeds per month.

9

16.     Case agents identified a confidential source, CS #1, who participated in distributing cocaine provided by the DTO in the Eastern District of Wisconsin. For several reasons, case agents believe that CS #1 is reliable and credible. First, CS #1 has been providing information since August of 2022 and is still an active informant. Second, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information have been corroborated through independent investigation. CS #1 originally began cooperating with law enforcement in hopes of receiving consideration for state drug trafficking charges. As a result of CS #1's cooperation, CS #1 was not convicted of these charges. They have been dismissed and will not be reissued. CS #1 is no longer working for potential criminal case credit. Currently, CS #1 is continuing to cooperate with law enforcement as a paid informant. CS #1 has prior felony convictions for robbery and a weapons violation. Finally, CS #1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents believe CS #1 to be reliable.

17.     In 2022, CS #1 was interviewed by case agents regarding CS #1's participation in distributing cocaine provided by the DTO in the Eastern District of Wisconsin. CS #1 told case agents that the cocaine is transported via a white Ford Transit van concealed in furniture or within a trap built into the vehicle's floor. CS #1 also stated that the driver of the white van is Brian Wilbert. Law enforcement database checks revealed a white Ford Transit van bearing Arizona license plate number Z6A6CAA was registered to Brian Wilbert. CS #1 stated that Wilbert was the primary source of transportation for the Long DTO. Wilbert is the cousin of Long and, like Long, has a residence in Gilbert, Arizona. CS #1 stated that upon receipt of the cocaine, the Long DTO sells the cocaine by the kilogram, frequently making multiple kilogram

10

sales per customer. CS #1 stated that the Long DTO has been actively operating in the Milwaukee area for approximately five years (this statement was made in 2022, so the five-year timeframe CS #1 referenced is approximately 2017 to 2022). Your affiant notes that the $630,000 - $720,000 of cocaine proceeds generated every month is between $7,560,000 - $8,640,000 per year; and between $37,200,000 - $43,200,000 over five years

18.    In 2022, CS #1 told case agents that the cocaine is transported via a white Ford Transit van concealed in furniture or within a trap built into the vehicle's floor. CS#1 also stated that the driver of the white van is Brian Wilbert. Law enforcement database checks revealed, a white Ford Transit van bearing Arizona license plate number Z6A6CAA was registered to Brian Wilbert. CS #1 stated that Wilbert was the primary source of transportation for the Long DTO. Wilbert is the cousin of Long and, like Long, has a residence in Gilbert, Arizona. CS #1 stated that upon receipt of the cocaine, the Long DTO sells the cocaine by the kilogram, frequently making multiple kilogram sales per customer. CS #1 stated that the Long DTO has been actively operating in the Milwaukee area for approximately five years (this statement was made in 2022, so the five-year timeframe CS #1 referenced is approximately 2017 to 2022). Your affiant notes that the $630,000 - $720,000 of cocaine proceeds generated every month accumulates to between $7,560,000 - $8,640,000 per year; and between $37,200,000 - $43,200,000 over five years.

19.    CS #1 stated that she/he regularly communicated with Wilbert through cellular telephones to coordinate delivery of narcotics over the past five years (approximately 2017 to 2022). Wilbert would contact CS #1 to coordinate the "drop" of cocaine and marijuana. Shipments of cocaine and marijuana were delivered to locations in Milwaukee, Wisconsin monthly and on several occasions biweekly for over five years. Throughout the duration of the shipment, CS #1, Wilbert, and Long would maintain contact to ensure delivery of the narcotics.

20.     On September 7, 2022, HSI and DEA Group 68 conducted a forensic analysis of the cellular telephone that was seized from the search warrant conducted at 5709 North 78th Street, Milwaukee, Wisconsin.  A review of the SMS text messages revealed conversations between CS #1 and Long.  The text thread covered a period of four months and detailed conversations between CS #1 and Long discussing the transportation and sale of narcotics.  Long frequently sent text messages highlighting when shipments, transported by Wilbert, of cocaine and marijuana were to be sent to CS #1.  Long would also notify CS #1 when packages of the narcotics proceeds were to be sent back to Los Angeles, California.  The text messages indicate that Long procured and directed the shipments of cocaine.

21.     CS #1 stated the currency-based proceeds from his/her cocaine sales were collected by CS #1 and shipped to John Marin via FedEx, from FedEx locations in the greater Milwaukee area.  Long had instructed CS#1 on how to arrange the currency and an invoice for jewelry in a FedEx package.  Long then periodically emailed FedEx shipping labels and fictitious invoices to CS#1.  CS#1 showed case agents several of the emails sent from Long.  Long's email address was illdreams88@gmail.com.  Listed on the invoices were high-dollar jewelry items, for example Rolex watches.  CS #1 stated that "jewelry" and jewelry-related terms are used as code words for the cocaine on the invoices to give the impression of a legitimate business transaction.  CS #1 has acknowledged to have mailed upwards of $275,000 at one time.

22.     CS #1 received an invoice from Long approximately every week from Long's email address.  The invoices primarily purported to be from JM Time Corp / R&J Watch Co, 631 S. Olive Street, #202, Los Angeles, California 90014.  However, other invoices purported to be from other businesses, including Virgo Stones and Jewelry and International Players Club Inc. (also known as IPC Jewelry), among others.  Open records check on the above listed businesses

12

indicate that JM Time Corp is a registered limited liability corporation with the state of California associated with Marin. Virgo Stones Jewelry does not have an official registration with the State of California or any other official entity, however, FedEx shipping labels reveal it is associated with Graciela Gonzalez-Cruz. International Players Club, / IPC Jewelry Company may be the same company that applied for an official registration with the State of California more than 20 years ago, in the name of a different individual. However, it is now associated with Michael Aleman, an associate of both John Marin and Carlos Ferreira, through bank records.

23. On October 19, 2022, law enforcement obtained a search warrant to track the location of Wilbert's 2019 White Ford Transit Van, bearing Arizona license plate number Z6A6CAA   On November 21, 2022, at approximately 9:00 AM, the Waukesha County Drug Group stopped Wilbert's white Ford van on Interstate 43 near the city of Mukwonago, Wisconsin. Wilbert was the driver and sole occupant. This area is in the southeastern corner of Waukesha County, Wisconsin within the Eastern District of Wisconsin. A K9 alerted to the presence of narcotics in the vehicle and the vehicle was later searched. The search yielded 3.7 kilograms of cocaine/fentanyl mix, 23.22 kilograms of marijuana, and 889 grams of psilocybin. All items were seized, and Wilbert was taken into custody.

24. On November 21, 2022, after being advised of and waiving his rights, Wilbert made a statement against his own penal interest. Wilbert admitted that he drove to Los Angeles on November 18, 2022, where he contacted a man named "Red," who owns jewelry stores in the area. Wilbert identified John Marin by photograph and as the same individual he knows as "Red." Wilbert stated that he picked up cocaine at a jewelry store at 631 S. Olive Street Suite 202. Wilbert stated that the jewelry store at 631 S. Olive Street, Suite 202, is owned by Marin

13

and is called JM Time Corp. Wilbert stated that he transports cocaine for Marin and has been doing so for the past three years. Wilbert stated he contacts Marin by using WhatsApp and showed case agents a text thread in WhatsApp between Wilbert and Marin. Case agents viewed the text thread in which Marin gave Wilbert instructions on when and how to pick-up cocaine at JM Time Corp. The phone number listed for Marin on WhatsApp is (949) 566-3012 (TARGET CELLPHONE). Wilbert stated when he stopped in front of JM Time Corp., Marin's assistant walked out of the jewelry store carrying a medium-sized black tote with a yellow lid. Wilbert said the assistant put the tote in Wilbert's van and walked back to the jewelry store. Wilbert said every time he has picked up narcotics from Marin, the assistant always brought out the narcotics and the narcotics were always in the exact same type of tote. Notably, the cocaine/fentanyl located in Wilbert's van on November 21, 2022, was stored inside a medium-sized black tote with a yellow lid. Based upon Wilbert's description of the assistant and on surveillance (electronic and physical) of the primary streetside entrance of 631 S. Olive Street in Los Angeles, California, your affiant believes the assistant is Rafael Ponce, who was listed as an alleged employee of JM Time Corp when Marin applied for a COVID loan in 2020, according to records received from Funding Circle. During a recorded interview of Antonio Long, Long was provided a picture of Ponce which and he positively identified as Rafael Ponce being John Marin's assistant.

25. Wilbert stated after he received the cocaine from Marin during the November 2022 trip, Wilbert drove south to Gardena, California. Wilbert said he stopped at a warehouse at the address of 1223 W. El Segundo Blvd, Gardena, California. He stated the address was where an unknown man named "C", whom your affiant now believes to be Carlos Ferreira, told him to go to pick up a load of marijuana. Wilbert stated he was there for about an hour while a group of

14

men canned and loaded marijuana in his van. The marijuana located in Wilbert's van on November 21, 2022, was stored in large aluminum cans that were sealed. Wilbert stated that after the marijuana was loaded into his van, he left the area and began driving toward Wisconsin.

26. Wilbert claimed he was going to drive to Milwaukee, Wisconsin to meet "BJ" to deliver the narcotics load. Wilbert was shown a photograph of Bobby Perry, a subject identified though this investigation as being one of the Milwaukee area distributors for this DTO. Wilbert identified the photograph of Bobby Perry as "BJ." Wilbert stated that he was going to deliver the narcotics to Perry's residence located at 3710 W. Good Hope Road, Milwaukee, Wisconsin. Wisconsin utility records listed Perry as the owner of 3710 W. Good Hope Road. Wilbert stated that for years, he has delivered narcotics to Perry and to Perry's residence. Wilbert said that Perry, Long, CS #1, and Wilbert would coordinate cocaine shipments multiple times per month and have done so for over three years. Wilbert stated that Long is the broker for all of the narcotics shipments for the past four to five years. Wilbert stated Long is in contact with Marin and "C." Wilbert stated Long will contact Marin and "C" to negotiate narcotics shipments to Milwaukee, Wisconsin. After Long has contacted Marin and "C," Long will contact Wilbert to determine which shipments Wilbert will transport. Wilbert stated that he generally gets paid $4,000 to transport the shipments and is paid in California before he begins the trip. Wilbert stated that, in the past, he has transported narcotics provided by Marin to other locations across the United States at Long's direction. Wilbert also gave the phone numbers for Marin (WhatsApp) 949-566-3812 (TARGET CELLPHONE) and Long 323-523-3432. The phone numbers provided have been identified as Marin and Long's phone numbers based on investigative findings and tolls analysis conducted by case agents.

15

27.     On January 26, 2023, HSI Milwaukee and HSI Casa Grande executed a federal search warrant at 2888 S. Beckett Street, Gilbert, Arizona, which is associated with Antonio Long.  HSI seized seven cellular telephones and two iPads from the residence and conducted a forensic examination of the devices.   Case agents reviewed each forensic examination conducted to preserve any evidence.  Notably, within the black iPad and two LG phones of the seizure, case agents discovered preprinted shipping labels and invoices saved within the devices in the form of images and documents.  These images were created and delivered via email and saved to Long's devices before being emailed, using bucksmke36@gmail.com and illdreams88@gmail.com, to the distributors in the Milwaukee area.

28.     The preprinted FedEx shipping labels are the same type of labels encountered previously in the investigation.  Both the shipper and receiver listed on most of the labels are Marin and/or R&J, with fewer FedEx labels listing both the shipper and receiver as Graciela Gonzalez [Cruz] / Virgo Stones, Michael Aleman / International Players Club (IPC Jewelry) and others.  The sending and receiving addresses are both located in the Los Angeles, California area.

29.     The invoices located on the devices included some from JM Time Corp / R&J Watch Co, Virgo Stones and IPC Jewelry, along with a purported business called "Buck Eyes", which listed its telephone number as (323) 497-4868 and its email address as bucksmke36@gmail.com, which is one of the email addresses used to send the JM Time Corp / R&J Watch Co invoices and FedEx labels to CS#1.

30.     Following the search of Long's residence in Arizona, Long was advised of and waived his rights.  Long then made a statement against his penal interest.  Long spoke to case agents about his cocaine and marijuana distribution activities.  Long confirmed that he would order shipments of narcotics from Marin and have Wilbert transport the narcotics to locations in

16

the greater Milwaukee, Wisconsin area.  During the interview, Long stated that the proceeds of the narcotics sales were packaged in FedEx Express packages and shipped to Marin and others in Los Angeles, California.  Long also acknowledged that he would receive preprinted shipping labels and invoices from Marin and others and email them using illdreams88@gmail.com and bucksmke36@gmail.com to narcotics distributors in Wisconsin.  Long was asked why the proceeds did not go to him directly, Long stated "everyone sent all the money to John (Marin) because he (Marin) has a system; the coke and the weed money went to him (Marin)."  "John (Marin) has a system," Long also stated.  Long also provided Marin's phone number (949) 566-3012 (TARGET CELLPHONE).

31.     CS #1 was subsequently questioned by case agents about the invoices and shipping labels found on Long's electronic devices.  CS #1 explained that the invoices for "Buck Eyes" are from Long.  CS #1 explained to agents that s/he would receive those invoices from Long for marijuana orders/purchases.  S/he stated that "Buck Eyes" is Long's marijuana venture. CS #1 said that s/he received invoices since the beginning when s/he was selling narcotics for the DTO.  CS #1 explained that at the start of the DTO, Long was selling marijuana.  S/he said that Long contacted suppliers in California and the suppliers would front the marijuana to Long. Long took orders from dealers in various locations within the US and coordinated the shipment of the marijuana to the dealers, via mail or vehicle.  CS #1 stated that first s/he received marijuana in the mail, but after the DTO got more business and orders became larger, Long employed Brian Wilbert to transport the narcotics.  CS #1 also stated that Long used "Buck Eyes" invoices in order to differentiate between marijuana and cocaine proceeds.

32.     CS #1 explained that after she/he received the narcotics, Long emailed an invoice from both illdreams88@gmail.com and bucksmke36@gmail.com with a shipping label.  CS #1

17

said the invoices would indicate how much money was to be sent via FedEx back to California. CS #1 stated that all the proceeds were mailed via FedEx and the proceeds were always sent to locations in the greater Los Angeles, California area. CS #1 stated that the recipient was typically John Marin but that other recipients were sometimes used, including Michael Aleman, Graciela Gonzalez-Cruz, Michelle Sabra, Fernando Talley, and others. CS #1 stated that s/he mailed several hundred thousand dollars per month in proceeds based on the invoices.

33. CS #1 stated that when bulk cash was shipped via FedEx, the money was packaged in three layers. The first layer had the bulk cash in a smaller box/envelope, the second layer contained the packaged cash box/envelope placed into a medium box with an invoice, the third layer contained all previous contents placed in a larger box that was sealed. The exterior of the third box would have the preprinted shipping label affixed to it and would be shipped FedEx Express.

34. Records obtained from Apple reveal that John Marin is the listed subscriber for its iCloud accounts identified as randj15@icloud.com and jmtimecorp@icloud.com. During an interview with law enforcement, Long admitted to trafficking cocaine with Marin and to using encryption apps and messages on his cellular telephone to facilitate and monitor narcotics trafficking. Long further admitted that he regularly sent Marin electronic payments for narcotics. Review of iMessages corroborates Long. For example, case agents located iMessages from Rafael PONCE (Marin's assistant) instructing Long to send payments to the randj15@icloud.com account. As another example, case agents located an iMessage in which Long instructed his daughter, Shaylyn Long, to send payments to randj15@icloud.com. Case agents are aware that Apple permits payments to be sent to iCloud accounts via a service called Apple Pay. Based on their training and experience, and the investigation to date, case agents

18

believe that the payments sent from PONCE and Shaylyn Long to randj15@icloud.com were for narcotics provided by Marin.

35.     On January 26, 2023, HSI Milwaukee executed a federal search warrant at 3710 W. Good Hope Road in Milwaukee, Wisconsin which is associated with Bobby Perry.  HSI seized several electronic devices including cellular telephones and computers.  Forensic examination of the devices revealed shipping labels and invoices from JM Time Corp / R&J Watch Co and some of the other previously mentioned companies.  Case agents also recovered multiple text threads discussing the purchase and sale of narcotics in Perry's phone.  The dates listed on these invoices and text threads cover the time between October 2022 and January 2023.

36.     Review of all documents and electronic devices from the above described search warrants confirm that Long was conspiring with John Marin to procure and transport  cocaine and marijuana from Los Angeles, California to distributors in the Milwaukee, Wisconsin area; and that Marin and Long conspired to disguise the shipments of the proceeds from the sale of those drugs as proceeds from the sales of jewelry by Marin's business, JM Time Corp / R&J Watch Co.  Marin initiated the money laundering scheme by producing fictitious jewelry sale invoices through Wave Financial USA, Inc.'s internet application, by producing disguised FedEx labels through IFS Inforsure, Inc, and by having those invoices and labels emailed to Long's email addresses.  Long then forwarded the invoices and FedEx labels to the Milwaukee area distributors, who used them to send the drug proceeds to Marin.  Further, the invoices were for amounts greater than $10,000 and CS#1 admits sending far more currency than the amounts of the invoices, which is evidence that Marin was obligated to file Forms 8300 with the United States' Department of Treasury.      Long used the bucksmke36@gmail.com and

19

illdreams88@gmail.com emails to facilitate the drug trafficking activity and the shipment of their proceeds.

37.     Case agents conducted mobile and static surveillance of John Marin on September 15, 2023.  Marin was initially observed in the morning walking his dog at approximately 8:31 AM.  Marin was surveilled walking back to his residence at 26822 Zapata Circle, Mission Viejo, California.  Case agents were able to identify two vehicles parked in Marin's driveway, a green Mercedes G Class with CA tag 9AAG660 registered to Midway HFCA LLC under John Marin and a white Cadillac Escalade with CA tag 8WMP114 registered to ACAR Leasing LTD under Piero Beluzarri.  Marin was observed later driving the Cadillac Escalade throughout the day.

38.     Case agents set up surveillance on JM Time Corp at 631 S Olive Street, Los Angeles, California.  631 S. Olive Street is a multi-business building and case agents were able to conduct surveillance of the exterior main door that is streetside on Olive Street.   While conducting surveillance at 631 S Olive Street, case agents observed both Rafael Lomeli and Rafael Ponce.  Both subjects are employees of Marin and work at JM Time Corp.  Lomeli was observed entering and leaving the business frequently throughout the day.  Case agents followed him on foot and observed Lomeli entering several jewelry stores on 6th Street, which is on the adjacent block to the east of JM Time Corp.  Ponce was seen in front of the business at approximately 3:15 PM.  Ponce was holding a package and standing behind a pillar and looking toward Olive Street, it appeared as though he was concealing himself.   A white Subaru (CA tag 9FNM965, RO registered owner, Michael Aleman, 605 W Kelso Ave, Inglewood, CA) stopped in front of the business and Ponce quickly handed a male driver the package he was holding. The driver of the Subaru appeared to be Michael Aleman.  After receiving the package, the Subaru abruptly drove away heading north on Olive Street.  Based on the information known

20

about both suspects, it is believed that Ponce had delivered bulk US currency to Aleman. At approximately 4:30 PM, Marin was observed entering the underground parking garage driving the Cadillac Escalade.

39.     Case agents also conducted an address check of Virgo Stones and Jewelry Co. at 12550 Crenshaw Boulevard, Hawthorne, California. This location was heavily receiving many narcotics proceeds parcels addressed to both Marin and Graciela Gonzalez-Cruz. The location is a large multistory luxury apartment complex that has an attached parking garage. Case agents made contact with the apartment manager, who informed case agents that she has never heard of Virgo Stones and Jewelry Co. The manager also stated that no business operates from that location. While speaking to the manager, she confirmed that both Gonzalez-Cruz and Michael Aleman reside together in the same unit (Unit #410). The manager also stated that apartment number 410 is registered under both of them (Aleman and Gonzalea-Cruz) and that the phone number 310-621-6320 is listed on the apartment for Gonzalez-Cruz. This phone number is also listed on all of the Virgo Stones and Jewelry Co. invoices for narcotic debts that were sent to cocaine dealers in Milwaukee. Case agents were able to confirm that Michael Aleman drives a white Subaru, which he parks in the apartment complex parking structure in his assigned parking spot.

40.     Federal Express provided records related to John Marin on two occasions. Based on those records, on the information found at the website for IFS Inforsure, Inc.(Inforsure), on the fact that most of Marin's FedEx packages were sent to Inforsure's Pasadena, California office, on the fact that Inforsure also has an office next to JM Time Corp / R&J Watch Co (R&J)'s office, and on a $2,025 payment to Inforsure from JM Time Corp's account at US Bank

21

on September 18, 2023, your affiant believes John Marin and/or others at R&J obtained their FedEx labels through Inforsure.

40. FedEx initially provided account information documents (Customer Summary and Customer Comment logs), transaction documents (Shipment Information Reports) and an Excel workbook, named "284294 Shipment database for information only", that contained entries summarizing every shipment associated with the addresses of 631 S. Olive Street Suite 202, Los Angeles, California, 959 E. Walnut Street, Pasadena, California, 12550 Crenshaw Blvd. #410, Hawthorne, California and 26822 Zapata Circle, Mission Viejo, California, for the one-year period beginning September 2021 and ending September 2022. That information included the statement, "They do let different businesses use their account number to ship."

41. The Excel workbook listed 15,595 domestic packages associated with 959 E. Walnut Street, Pasadena, California 91106 or 631 S. Olive Street Suite 202, Los Angeles, California 90014. The shipment dates began with September 27, 2021, and ended with September 15, 2022.

42. A photograph of the directory of business offices at 631 S. Olive Street, Los Angeles, California, taken on March 11, 2023, revealed the occupant of suite 202 as "RandJWatchCo", which is similar to the business listed on the FedEx labels (R&J).

43. A review of the information appearing on the 15,595 FedEx packages reveals only 202 were directly traceable to John Marin by his name, by use of both the Olive Street and Walnut Street addresses, or by his business name of R&J (RJ). Analysis of the information concerning those 202 packages revealed the following:

22

a.   149 (74%) of the packages were labeled as sent from John Marin and R&J, 631 S. Olive Street Suite 202, Los Angeles, California to John Marin and Ortho Lab, 959 E. Walnut Street, Pasadena, California.

b.   2 of the packages were labeled as sent from John Marin and R&J, 631 S. Olive Street, Los Angeles, California to John Marin and R&J, also at 631 S. Olive Street, Los Angeles, California.

c.   1 of the packages was labeled as sent from John Marin and R&J, 631 S. Olive Street, Los Angeles, California to John Marin / IWJG at 3801 Las Vegas Blvd., Las Vegas, NV.

d.   Thus, 152 (75%) of the FedEx shipments were from Marin to Marin.

e.   The total cost to ship the Marin-to-Marin packages was $5,123, for an average cost of $33.70.

f.   The total original weight of the packages was 502 pounds, for an average weight of 3.3 pounds.   {Assuming those packages were filled with $100 bills, the potential amount of currency shipped in those packages amounts to $ 22,790,800 (454 grams/pound multiplied by the 502 pounds of packages equals 227,908 grams; 227,908 grams equals 227,908 dollar bills, multiplied by $100 equals $22,790,800, over a one-year period.}

g.   Just 50 of the 202 packages (<25%) involved persons other than just Marin and his alleged businesses.

   i.   36 of the 50 packages (72%) were labeled as sent by John Marin / R&J, 631 S. Olive Street, Los Angeles, California.   The total original weight of

23

these packages was 51 pounds, for an average of 1.42 pounds, which is less than one-half of the weight of the Marin-to-Marin packages.

    ii.   The remaining 14 packages, except for 2, were identified as definitely tied to Marin and were packages whose labels indicate the shipment originated from non-Marin 3rd parties and were destined for Marin and/or his RJ (R&J) or Ortho Lab aliases, at either 959 E. Walnut Street (11 packages) or 631 S. Olive Street (3) packages.

   h.   Thus, John Marin's use of FedEx to ship packages from 3rd party customers, as opposed to from himself to himself was an average of just once per month.

44.   "Shipment Information Reports" (SIRs) provided by FedEx in its "Tracking Documents" folder revealed the SIRs included "Pickup Location" and "Destination Location" information in the form of four and five-letter codes. The pickup and destination codes for the 152 Marin-2to-Marin labeled packages reveals that 116 (76%) of the Marin-2to-Marin packages were sent from the Milwaukee, Wisconsin area during the one-year period of September 2021 to September 2022.

45.   In sum, this demonstrates that FedEx parcels were physically shipped from various locations outside of California but with shipping labels designed to make the parcels appear to have been sent from a Marin business in California to a different Marin business in California.

46.   Your affiant believes these results do show the following:

   a.   They corroborate the statements given by the cooperating individuals to law enforcement officers.

24

b.  They provide probable cause to believe John Marin used his business(es), located at 631 S. Olive Street, Suite 202, Los Angeles, California to "conceal the nature, source, location, ownership, or control of" financial transactions involving his illegal drug proceeds, in violation of Title 18 USC, Section 1956.

47.  A second subpoena was served on Federal Express to extend the time-period for possible Marin-to-Marin packages.  In response, FedEx provided package data from August 1, 2022, through June 3, 2023.  The new FedEx data revealed 63 additional packages, after removing the duplicates from FedEx's first response were directly traceable to John Marin by his name, by use of the Olive Street or Walnut Street addresses, or by his business name, R&J (RJ).  These 63 new FedEx shipments were addressed as both being from shipper name John Marin in California to recipient company name John Marin or John Marin R&J in California.

48.  Specifically, 56 of the packages were labeled as sent from shipper name John Marin and shipper company R&J/RJ at 631 S. Olive St STE 202, Los Angeles, California to recipient name Ortho Lab/John Marin R&J and recipient company name John Marin/John Marin R&J at 959 E. Walnut Street, Pasadena, California.  Additionally, seven of the packages were labeled as sent from John Marin and R&J, 631 S. Olive St STE 202, Los Angeles, California to John Marin R&J, also at 631 S. Olive Street, Los Angeles, California.

49.  The information contained in FedEx's "Shipment Information Reports" (SIRs) reveals that between September of 2022 and June of 2023, the "Marin to Marin" packages entered the FedEx system in eleven different states, including two packages sent from Milwaukee, Wisconsin. Thus, there was a stark decline in the number of packages entering the FedEx system in Milwaukee, which is consistent with the fact that CS#1 was arrested in August of 2022.

50.     A comparison of the shipping label data for all packages labeled through Inforsure revealed a distinct difference in the data appearing on labels produced for other jewelry companies and those produced for the Marin-to-Marin packages.  Shipments from other jewelers typically provided unique sender and/or business name information and listed the initial recipient's name as Ortho Labs with the secondary recipient's company name typically being that of the business ultimately receiving the package.  Use of Open-Source resources such as Google allowed one to easily locate legitimate, jewelry businesses and/ or their physical locations and owners by simply searching the name.  This was also true for the 50 seemingly legitimate Marin-related packages found in the first set of FedEx documents.  However, the "Marin to Marin" parcels, where Marin is seemingly shipping packages that are both coming from and going to himself, which is known to be untrue based on the location the packages entered and exited the FedEx system, hid the identity of the person sending the package, as well as the location where the package originated.  This is further corroborated by CS #1's statement that this method was employed by the group to send narcotics proceeds back to Marin as payment.  The simultaneous use and abuse of IFS Inforsure, Inc., AKA Ortho Lab's insured shipping services, demonstrates that John Marin understands how to properly utilize and how to exploit this service for insuring his illegitimate narcotics proceeds parcels the same way he insures his legitimate business parcels.

51.     CS #1 also stated that narcotics proceeds were sent to co-conspirator Graciela Gonzalez Cruz. Analysis of the second FedEx return revealed Gonzalez Cruz used a similar shipping scheme as John Marin for 22 FedEx parcels sent between August 23, 2022 and May 31, 2023. Labels were generated bearing shipper name Graciela Gonzalez at 12550 Crenshaw Blvd, Hawthorne, California to recipient name Graciela Gonzalez and recipient company name Virgo

26

Stones & Jewelry also at 12550 Crenshaw Blvd, Hawthorne, California (some packages specify Apartment 410). The label also included the phone number for Gonzalez Cruz as (310) 621-6320. Gonzalez Cruz is known to live in apartment 410 at this address. Analysis of the locations where the parcels entered the FedEx system reveals they did not originate in California, thus falsifying the label that was utilized. This pattern matches the scheme Marin utilized to ship narcotics proceeds.

52.     Your affiant notes that email evidence obtained from Google, as described below, reveals many additional invoices (approximately 75) were received by bucksmke36@gmail.com during the seven (7) month period for which records were requested from Google; i.e., January 2022 through July 2022, which were not provided by Wave Financial. Those seven months exclude data for the periods of July 2021 through December 2021.

53.     Your affiant believes these results of the FedEx subpoenas corroborate CS #1's statements to law enforcement officers regarding the remittance of narcotics proceeds to California using pre-generated FedEx labels provided to them. Additionally, they provide probable cause to believe John Marin used his business(es), located at 631 S. Olive Street, Suite 202, Los Angeles, California to "conceal the nature, source, location, ownership, or control of" financial transactions involving his illegal drug proceeds, in violation of Title 18 USC, Section 1956(a)(1)(B)(i). The results reveal a strong, continuous and deliberate pattern of illicit narcotics proceeds concealment. Further, they are evidence of Marin's conspiracy with Long and others to use a communication facility (Federal Express and Google Mail) to enhance their drug trafficking activities, in violation of Title 21 United States Code, Sections 841, 846 and 843(b), use of a communication facility.

27

54.     Search warrants were served on Google to obtain the Gmail email contents for the following accounts during the limited date ranges:

a.     bucksmke36@gmail.com  (01/01/2022 – 08/01/2022)

55.     Google's search warrant response for the bucksmke36 gmail (Gmail) account revealed the account was associated with Antonio Long and contained 509 emails.  During the seven (7) months from 01/10/2022-07/25/2022, bucksmke36@gmail.com received seventy-six (76) emails from Wave Financial via mailer@waveapp.com.   The emails contained invoices from JM Time Corp / R&J Watch Co.  The emails containing the invoices were forwarded through bucksmke36@gmail.com to CS#1 email address {fifty-five (55) invoices} and bobbyperry365@yahoo.com {nineteen (19) invoices}.  Also, on 01/03/2022, an email was forwarded through bucksmke36@gmail.com to bobbyperry365@yahoo.com containing an invoice from business "SB Stainless Settings".

56.     During the same seven (7) months, bucksmke36@gmail.com received seventy-six (76) emails from info@shipinfosure.com, with the subject line, "A Label from R&J".  The body of each email possessed the greeting "Dear John Marin" and contained a link to a premade FedEx shipping label. The emails were forwarded through bucksmke36@gmail.com to CS#1's email address {fifty-five (55) labels} and bobbyperry365@yahoo.com {twenty (20) labels}.

57.     Further analysis of the bucksmke36@gmail.com search warrant return indicated that the account was used almost exclusively to forward invoices and FedEx labels to Milwaukee-based narcotics distributors.

b.     illdreams88@gmail.com (11/25/2021-09/29/2022)

58.     Google's search warrant response for the illdreams88 Gmail revealed the account was associated with Antonio Long and contained 11,593 emails. Between 01/21/2022-

28

07/25/2022, illdreams88@gmail.com received fifteen (15) emails from mailer@waveapps.com, which transmitted invoices from the following businesses, which are affiliated with the accompanying persons:

      a.   "Prestige Fine Metals" (Michelle Sabra) {eight (8) invoices},

      b.   "SB Stainless Settings" (Fernando Talley) {three (3) invoices}, and

      c.   "Virgo Stones and Jewelry Co. (Graciela Gonzalez-Cruz) {four (4) invoices}. Thirteen (13) of these invoices were forwarded through illdreams88@gmail.com to CS#1's email address {eight (8) invoices} and bobbyperrry365@yahoo.com {five (5) invoices}.

59.     Between 02/22/2022-07/25/2022, illdreams88@gmail.com received thirteen (13) emails with the subject line "Label" from sbstainlesssettings@gmail.com {four (4) labels}, msabra@prestigefinemetal@gmail.com {five (5) labels}, and virgostonesjewelry@gmail.com {four (4) labels}. All emails contained a link to a FedEx label. The emails and attachments were forwarded through illdreams88@gmail.com to CS#1's email address {eight (8) labels} and bobbyperry365@gmail.com {five (5) labels}.

60.     Further analysis of the contents of illdreams88@gmail.com warrant return indicated that Antonio Long also utilized the account for personal and business use.

      c.   virgostonesjewelry@gmail.com (01/01/2022-06/30/2022)

61.     Google's search warrant response for the virgostonesjewelry Gmail produced account documents, including subscriber records, however, no emails were provided. The subscriber record contained the following information: Google Account ID: 22975214882, Name: Graciela Gonzalez Cruz, Account created date: 03/21/2022, and Recovery number 1 (310) 621-6320. Your affiant notes that queries of commercial databases for phone number (310)

29

621-6320 show Graciela Gonzalez Cruz (Date of Birth: 09/16/1992) was associated with the phone number from March 2011-Present.

62.     On September 9, 2024, case agents received documents for a subpoena to CashApp for John Marin.  The subpoena contained CashApp transactions covering a date range from July 2022 to July 2024.  Case agents analyzed the documents and observed that Antonio Long attempted approximately 27 payments to Marin that totaled $32,699.  Those payments were either expired while waiting on sender, exceeded monthly limit, or declined.  Long had successfully sent approximately 47 payments to Marin that totaled $31,700.  Prior to a search warrant on Long's residence in January 2023, Long was sending several thousand-dollar payment transactions to Marin under the sender listed directly as Antonio Long.  After the search warrant, Long began sending multiple payment transactions per month that generally would total the same dollar amount that he was previously sending.  It was also noted that Long began sending the payment transactions under the sender's name and account of NorthBay Freight, which is an attempt to disguise the source of the funds.  The payments to Marin from Long are believed to be payments for a narcotics debt that Long owes to Marin for cocaine.  This was confirmed directly by Long during a Mirandized interview following the search warrant executed on his residence in January 2023.  During that interview, Long stated that he owed Marin over $250,000 for a narcotics debt.  Long also stated that he was making payments to Marin via CashApp and would send payments ranging from $300 to $2,000 for that debt.  Long said that he would pay the amounts based on what funds he had available at that time.

63.     Based upon these records, and Long's prior admissions that he had a substantial drug debt that he owed to Marin and that he would make periodic payments based upon his available funds, I believe that Long continued to pay Marin related to their prior drug

30

transactions even after the execution of a federal search warrant at Long's residence. Based upon the records, Long made what I believe to be a payment to Marin towards the drug debt as recently as July 2024.

64. Case agents obtained and monitored a court ordered WhatsApp pen register from December 2022 to the present. The WhatsApp is very active and the phone number (949) 566-3012 (TARGET CELLPHONE) is the subscriber for the account and John Marin is the account holder. Marin is in regular communication with Antonio Long, Raphael Lomeli, Carlos Ferreria, Michael Aleman, and Raphael Ponce and other members of the Marin MLDTO. On November 13, 2024, case agents received an updated subscriber subpoena for (949) 566-3012 (TARGET CELLPHONE) which continues to be subscribed to John Marin.

65. On November 14, 2024, United States District Court Judge Maria Audero of the Central District of California issued a search warrant for John Marin's residence, business, and person. Case agents intend to execute these warrants within the next week and need the ability to track the location of Marin's cellphone (TARGET CELLPHONE) to assist in locating Marin to execute the search warrant of his person.

66. Toll analysis was conducted on a telephone number associated with Michael Aleman. Between July 4, 2022, and August 7, 2024, Aleman had 124 contacts with Marin at phone number (949) 566-3012 (TARGET CELLPHONE). Aleman's phone number also has communication with Carlos Ferreira, Rafael Lomeli, Graciela Gonzalez, Rafael Ponce, Brian Wilbert and Antonio Long.

67. In my training and experience, I have learned that Verizon is a company that provides cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate

31

information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

68. Based on my training and experience, I know that Verizon can collect E-911 Phase II data about the location of the TARGET CELLPHONE, including by initiating a signal to determine the location of the TARGET CELLPHONE on Verizon's network or with such other reference points as may be reasonably available.

69. Based on my training and experience, I know that Verizon can collect cell-site data on a prospective basis about the TARGET CELLPHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers

32

such as Verizon typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## TECHNICAL BACKGROUND

70.     Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Service Provider's network or with such other reference points as may be reasonably available.

### A.  Cell-Site Data

71.     In my training and experience, I have learned that Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

33

72.     Based on my training and experience, I know that Service Provider can collect cell-site data on a historical and prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business to use this information for various business-related purposes.

### B.     E-911 Phase II / GPS Location Data

73.     I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

74.     As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

34

75.     I also know that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time, or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

76.     Based on my training and experience, I know that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

77.     Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

C.  **Pen-Trap Data**

78.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms,

35

including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

### D. Subscriber Information

79.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.

### AUTHORIZATION REQUEST

80.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

81.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable

cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the TARGET CELLPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

82.     I further request that the Court direct Verizon to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon. I also request that the Court direct Verizon to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon USA's services, including by initiating a signal to determine the location of the TARGET CELLPHONE on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

37

83.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET CELLPHONE outside of daytime hours.

84.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

## ATTACHMENT A

### Property to Be Searched

1.   The cellular telephone assigned call number (949) 566-3012, with listed subscriber John MARIN (the "TARGET CELLPHONE"), whose wireless communications service provider is Verizon, headquartered at 180 Washington Valley Road, Bedminster, New Jersey, 07921.

2.   Records and information associated with the TARGET CELLPHONE that is within the possession, custody, or control of Verizon, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period from November 1, 2024, to present:

   i. Names (including subscriber names, usernames, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number

2

("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

  viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records; and

    ix.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

  b.  Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

3

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the

4

Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribution of cocaine), 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate distribution of cocaine), 18 U.S.C. § 1956 and 1957 (money laundering), 18 U.S.C. § 1956(h) (money laundering conspiracy), and 31 U.S.C. § 5331 (failure to file Form 8300, Reports of Cash Payments Over $10,000 Received in a Trade or Business) involving Brian WILBERT, Antonio LONG, John MARIN, Bobby PERRY, Graciela GONZALEZ CRUZ, Michael ALEMAN, and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

5